IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

AARON SWANK,

        Plaintiff,                Civil Action 2:12-cv-1031

     v.                      Judge Marbley
                                  Magistrate Judge King

DR. HALE,

        Defendant.

<u>REPORT AND RECOMMENDATION</u>

This is a civil rights action under 42 U.S.C. § 1983 in which plaintiff, a state inmate who is now represented by counsel,[1] alleges that defendant was deliberately indifferent to plaintiff's serious medical needs in violation of plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution.  This matter is now before the Court on *Defendant's Motion for Summary Judgment*, ECF 62 ("*Motion*").  Plaintiff opposes the *Motion*, ECF 70 ("*Memo. in Opp.*"), and defendant has filed a reply memorandum, ECF 76 ("*Reply*").  For the reasons that follow, it is **RECOMMENDED** that the *Motion* be **GRANTED**.

I.    BACKGROUND[2]

A.    **Pickaway Correctional Institution and the Collegial Review**

---

[1] Although plaintiff originally filed the action without the assistance of counsel, counsel later entered an appearance on plaintiff's behalf.  *Notice of Appearance of Counsel for Plaintiff Aaron Swank*, ECF 30.

[2] Throughout his *Memo. in Opp.*, plaintiff relies on medical and prison records that have not been authenticated.  *See*, *e.g.*, *Memo. in Opp.*, pp. 3-10, 15 (citing to Exhibit B, ECF 72 (filed under seal)).  However, unauthenticated documents cannot be considered at the summary judgment stage.  *See*, *e.g.*, *Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible." "[U]nauthenticated documents do not meet the requirements of Rule 56(e)") (internal quotation marks and citations omitted); *Fox v. Mich. State Police Dep't*, No. 04-2078, 173 F.App'x 372, at *375 (6th Cir. Feb. 24, 2006) (affirming decision to disregard documents that "were neither sworn nor certified, were not properly authenticated and were therefore inadmissible in evidence").

**Process**

Compared to other correctional institutions in the State of Ohio, Pickaway Correctional Institution ("PCI") is considered a medical facility that provides, *inter alia*, management of chronic diseases such as diabetes, hypertension, and hepatitis C. *Deposition of Dr. Arthur Hale*, ECF 61, pp. 22-25[3] ("*Hale Deposition*"). PCI contains a chronic care clinic ("CCC") whose physicians see approximately 1,000 chronic care PCI inmates[4] on a regular basis, *i.e.*, every 30, 60, or 90 days depending on clinical need. *Id*. at 24-25. PCI also contains Frazier Health Center ("FHC"), a long-term care facility that functions as a nursing home unit; FHC also offers medical dorms. *Id*. at 25-26, 55, 60-61. Dorm B1 is a self-contained medical dorm with an assigned nurse; it is accessible to wheelchairs and is located close to the dining hall. *Hale Deposition*, pp. 26, 61, 131-32. FHC houses inmates with severe or significant medical issues, including inmates with cancer and those needing oxygen and inmates who have difficulty performing activities of daily living such as bathing, toileting, dressing themselves, and transferring into and out of bed. *Id*. at 55-57. The difference between B1 and FHC is that oxygen is available in the latter facility. *Id*. at 62-63. When a new inmate is transferred to PCI, defendant Dr. Arthur Hale, PCI's Chief Medical Officer ("CMO") since January 2012, determines where that inmate should be housed based on the inmate's medical needs. *Id*. at 19-22, 59-60.

As CMO, defendant also oversees physicians and nurse

---

[3]The Court refers to the deposition page numbers in the upper right corner of each page.

[4]Inmates are enrolled in the chronic care program based on their diagnoses. *Id*. at 24.

practitioners and spends eighty percent of his time seeing patients,
including chronic care patients; he spends twenty percent of his time
handling administrative matters. *Id*. at 22-24, 28.  In addition,
defendant participates in the Collegial Review process.  *Id*. at 64-70.
That process begins when a physician or nurse practitioner[5] recommends
a patient for a consultation.  *Id*. at 65.  Defendant reviews these
requests for a consultation and either submits the request to a
healthcare information technician ("HIT") for inclusion on the list
for Collegial Review or returns the request to the provider with a
recommendation for additional information.  *Id*. at 50, 65.  The
recommendations for consultation that are included on the Collegial
Review list are discussed on a weekly basis by a group that includes
defendant, Andrew D. Eddy, M.D. (ODRC's State Medical Director), John
Gardner (nurse practitioner), an HIT, and a healthcare administrator.
*Id*. at 65-67; *Affidavit of Andrew D. Eddy, M.D.*, ECF 62-3, ¶ 3 ("*Eddy
Affidavit*").  During these sessions, defendant acts as an advocate for
the inmates.  *Hale Deposition*, pp. 70-71, 79.  After discussion, the
Collegial Review team authorizes either the requested test or
consultation or an alternative plan of care.  *Id*. at 67-68.  The
patient is then seen again in conformity with the Collegial Review's
recommendation.  *Id*. at 68.  If the provider disagrees with the
Collegial Review's action, the provider may resubmit the request for
further consideration.  *Id*.  For example, defendant has contacted Dr.

---

[5] Defendant also refers to the role of "ALPS" in this process throughout his
deposition, but does not specifically define this term.  *See*, *e.g.*, *id*. at
65-66.  The Court understands from the context in which it was used that
"ALPS" are advanced level providers such as physicians or nurse
practitioners.  *See*, *e.g.*, *id*. at 65, 92-93.

Eddy on behalf of an inmate who needed to begin chemotherapy treatment sooner than had been authorized. *Id*. at 79-80.

**B.   Plaintiff's Medical Care at PCI**

Plaintiff was transferred from the Warren Correctional Institution ("WCI") to PCI on July 17, 2012. ECF 62-6, p. 1[6] (sealed progress notes). Once at PCI, plaintiff shared his medical history and treatment, which included a Type I Chiari Malformation (brain defect that affects balance), "numerous issues regarding chronic LBP [low back pain,]" epidural steroid injections ("ESIs") at the pain clinic at The Ohio State University ("OSU"), use of a knee brace and use of a Transcutaneous Electrical Nerve Stimulation ("TENS") unit on his lower spine. *Id*. at 311-12; *Eddy Affidavit*, ¶ 8. Plaintiff was housed for some time in FHC, but at some point was transferred to B1. ECF 62-6, p. 14; *Hale Deposition*, pp. 87-88, 131.

From the time that he entered PCI on July 17, 2012 until at least the time that he filed this action on November 13, 2012, *see Complaint*, ECF 13, plaintiff was regularly seen at nurse's sick call ("NSC")[7] (July 19 and 26, 2012; August 6 and 14, 2012; September 7 and 16, 2012; October 2, 17, and 23, 2012; November 8, 2012) and at doctor's sick call ("DSC") (July 20 and 27, 2012; August 2, 7, 14, and 28, 2012; September 11, 18, and 25, 2012; October 3 and 18, 2012;

---

[6] The Court refers to the page numbers appearing on the lower right corner of each page.
[7] When an inmate completes a Health Service Request form, a nurse screens the request and determines, based on the medical issue presented, whether the inmate is seen at nurse's sick call (staffed by registered nurses) or at doctor's sick call (staffed by physicians and nurse practitioners). *Hale Deposition*, pp. 45-46.

November 2, 2012).[8]  *See* ECF 62-6 (progress notes), pp. 2-20; ECF 62-7
(physician's orders).  Plaintiff also underwent a "monthly assessment"
on July 17, 2012 and on August 18, 2012 and was assessed at the CCC on
October 26, 2012.  ECF 62-6, pp. 1, 9, 20.  During this same period,
some of plaintiff's requests for medical care were denied.  *See
generally* ECF 62-6.

### C.    Procedural History

Plaintiff filed this civil rights action on November 13, 2012,
alleging that defendant was deliberately indifferent to plaintiff's
serious medical needs in violation of plaintiff's Eighth Amendment
rights.  *Complaint.* The *Amended Complaint*, ECF 31, alleges the
following:

> 20.   While incarcerated at PCI under Dr. Hale's care, *inter
> alia*, Plaintiff has been transferred out of a medical
> housing unit without just cause, has not been able to
> consult with an orthopedic doctor who could assist him with
> treatment of his knee injuries, has been unable to receive
> any treatment directly addressing his chiari brain
> malformation, has not been issued a wheelchair which he
> desperately needs, has not been given other medical
> equipment he desperately needs (e.g., adequate knee
> braces), has not had any sessions of physical therapy, and
> has been at constant risk of not being able to eat meals on
> a regular basis without having to rely on others for
> assistance.

*Amended Complaint*, ¶ 20.

## II.  STANDARD

The standard for summary judgment is well established.  This
standard is found in Rule 56 of the Federal Rules of Civil Procedure,
which provides in pertinent part:

> The court shall grant summary judgment if the movant shows

---

[8]Plaintiff was scheduled to be seen at DSC on October 15, 2012, but did not
appear.  ECF 62-6, p. 20.

that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  In making this determination, the evidence
must be viewed in the light most favorable to the non-moving party.
*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Summary judgment
will not lie if the dispute about a material fact is genuine, "that
is, if the evidence is such that a reasonable jury could return a
verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).  However, summary judgment is appropriate if the
opposing party fails to make a showing sufficient to establish the
existence of an element essential to that party's case and on which
that party will bear the burden of proof at trial.  *Celotex Corp. v.*
*Catrett,* 477 U.S. 317, 322 (1986).  The mere existence of a scintilla
of evidence in support of the opposing party's position will be
insufficient; there must be evidence on which the jury could
reasonably find for the opposing party.  *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial
responsibility of informing the district court of the basis for its
motion, and identifying those portions of the record which demonstrate
the absence of a genuine issue of material fact.  *Catrett,* 477 U.S. at
323.  Once the moving party has met its initial burden, the burden
then shifts to the nonmoving party who "must set forth specific facts
showing that there is a genuine issue for trial."  *Anderson,* 477 U.S.
at 250 (quoting former Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino*
*Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995)("nonmoving party
must present evidence that creates a genuine issue of material fact
making it necessary to resolve the difference at trial").  "Once the

6

burden of production has so shifted, the party opposing summary judgment cannot rest on the pleadings or merely reassert the previous allegations.  It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'"  *Glover v. Speedway Super Am. LLC,* 284 F. Supp.2d 858, 862 (S.D. Ohio 2003)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, the non-moving party must support the assertion that a fact is genuinely disputed.  Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover,* 284 F. Supp.2d at 862 (citing *InteRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989)).  Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Id.  See also* Fed. R. Civ. P. 56(c)(3).

## III. EXHAUSTION

The *Amended Complaint* alleges that plaintiff has not been provided with a variety of needed medical services and treatments, amounting to deliberate indifference in violation of plaintiff's Eighth Amendment rights.  *See*, *e.g.*, *Amended Complaint*, ¶¶ 14-18, 20, 24-31.  In moving for summary judgment, defendant first argues that plaintiff has exhausted his administrative remedies as to some, but

7

not all, of the incidents that underlie plaintiff's Eighth Amendment claim. *Motion*, pp. 2-5.[9]

The Prison Litigation Reform Act requires that a prisoner filing a claim under federal law relating to prison conditions must first exhaust available administrative remedies. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). The statute provides, in pertinent part:

> No action shall be brought with respect to prison conditions under [section 1983 of this Title], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In order to satisfy this exhaustion requirement, an inmate plaintiff must "complete the administrative review process in accordance with the applicable procedural rules[.]" *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). "Failure to exhaust is an affirmative defense under the PLRA, and [] inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). A defendant bears the burden of pleading and proving this affirmative defense by a preponderance of the evidence. *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015). Exhaustion is not a jurisdictional predicate but the requirement is nevertheless mandatory, *Wyatt v. Leonard*, 193 F.3d 876, 879 (6th Cir. 1999), even if proceeding through the administrative procedure would appear to the inmate to be "futile." *Hartsfield v. Vidor*, 199 F.3d 305, 308-10 (6th Cir. 1999).

---

[9] The Court refers to the numbers appearing at the bottom of the page.

Ohio has established a procedure for resolving inmate complaints. Ohio Admin. Code ("O.A.C.") § 5120-9-31.  The procedure is available to an inmate "regardless of any disciplinary status, or other administrative or legislative decision to which the inmate may be subject," O.A.C. § 5120-9-31(D), and is intended to "address inmate complaints related to any aspect of institutional life that directly and personally affects the grievant," including "complaints regarding policies, procedures, conditions of confinement, or the actions of institutional staff."  O.A.C. § 5120-9-31(A).  Certain matters are not grievable, however, including "complaints unrelated to institutional life, such as legislative actions, policies and decisions of the adult parole authority, judicial proceedings and sentencing or complaints whose subject matter is exclusively within the jurisdiction of the courts or other agencies."  O.A.C. § 5120-9-31(B).

The grievance procedure established by O.A.C. § 5120-9-31 involves three (3) steps.  First, an inmate must file an informal complaint within fourteen days of the event giving rise to the complaint.  O.A.C. § 5120-9-31(K)(1).  The informal complaint must be addressed "to the direct supervisor of the staff member, or department most directly responsible for the particular subject matter of the complaint." *Id.*  If the informal complaint is resolved in a manner that is unsatisfactory to the inmate, the inmate must file a notification of grievance with the inspector of institutional services within fourteen days. O.A.C. § 5120-9-31(K)(2).  If the inmate is dissatisfied with the disposition of the grievance, the inmate must then appeal to the office of the chief inspector within fourteen days.

9

O.A.C. § 5120-9-31(K)(3).  "The decision of the chief inspector or designee is final."  *Id*.  Remedies for valid grievances include "changes to institutional policies or procedures, the implementation of new policies or procedures, and/or corrective action specific to the inmate's complaint."  O.A.C. § 5120-9-31(L).  Dismissal without prejudice of a civil rights complaint is appropriate if a prisoner fails to first exhaust available administrative remedies.  *See*, *e.g.*, *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Crump v. Darling*, No. 03-2086, 2005 U.S. App. LEXIS 29546, at *3-4 (6th Cir. July 6, 2005).

In the case presently before the Court, defendant argues that plaintiff exhausted only two grievances, PCI-09-12-000049 and PCI-09-12-000050, which raised complaints about four specific courses of treatments:

1.   Denial of a neurology clinic evaluation for his Type I Chiari Malformation,

2.   Denial of an orthotics clinic consult to adjust his knee braces,

3.   Discontinuation of epidural steroid injections ("ESIs") at the OSU pain clinic, and

4.   Denial of a prescription for the non-formulary medication, glucosamine.

*Motion*, p. 4 (citing *Affidavit of Mona Parks, R.N.*, ECF 62-1, ¶ 10 ("*Parks Affidavit*"); ECF 62-5 (grievance records)).[10]  Defendant

---

[10] Nurse Parks is a registered nurse employed as ODRC's Assistant Chief Inspector whose duties include, *inter alia*, investigating and responding to grievance appeals concerning medical diagnosis or a specific course of treatment.  *Parks Affidavit*, ¶¶ 2-3.  Nurse Parks investigated and responded to plaintiff's appeals of grievances PCI-09-12-000049 and PCI-09-12-000050. *Id*. at ¶ 10 (authenticating attached copies of appeals, decisions, and underlying informal complaints, grievances, and responses).

contends that the *Amended Complaint* contains allegations regarding only the first two courses of treatment (neurology and orthotics consults), "but out of an abundance of caution, Dr. Hale also addresses Plaintiff's other two complaints concerning ESIs and glucosamine in this Motion." *Id.*  Defendant also argues that plaintiff has failed to exhaust available administrative remedies as to the other alleged denials of care underlying his deliberate indifference claim, including his allegations regarding his transfer from FHC, no wheelchair, no physical therapy, and inaccessible meals. *Id.* at 4-5 (citing *Amended Complaint*, ¶ 20).

Plaintiff does not specifically contend that he submitted these particular claims to the prison grievance process. Rather, plaintiff contends that his "use of the grievance process put Defendant on notice of general claims regarding the adequacy of medical care[.]" *Id.* at 12.  Plaintiff argues that he therefore satisfied the exhaustion requirement because "the central inquiry [in determining exhaustion] is whether the inmate has put Defendant on notice of the subject of his complaints[.]" *Memo. in Opp.*, pp. 10-11 (collecting cases).  Plaintiff specifically contends that the Chief Inspector, who considered plaintiff's final grievance appeal, identified a range of plaintiff's conditions and treatments, including those that defendant now argues were never raised:  Plaintiff's transfer from FHC; the refusal to prescribe a wheelchair; and "not being able to eat on a regular basis[.]"  *Id.* (citing ECF 62-5, PAGEID#:623) (copy of one page of the Decision of the Chief Inspector on a Grievance Appeal, dated October 25, 2012)).  Even if he failed to exhaust these

particular issues underlying his deliberate indifference claims, plaintiff argues, defendant is nevertheless estopped from asserting a failure to exhaust because the Chief Inspector fully considered plaintiff's medical conditions and treatments. *Id.* at 13 (citing *Reynolds-Bey v. Harris-Spicer*, No. 09-1472, 428 F.App'x 493, at *493 (6th Cir. Apr. 13, 2011)).

Defendant disagrees that plaintiff's grievances put defendant on notice of plaintiff's complaints because defendant was not the subject of plaintiff's grievances; rather, plaintiff's grievances complained that "Central Office" denied specific courses of treatment that defendant had recommended for him. *Reply*, p. 3. In addressing plaintiff's contention that the *Motion* is arbitrary in its attempt to distinguish every condition, diagnosis, and treatment, defendant argues that Ohio's inmate grievance procedure requires such a distinction.

As discussed *supra*, the PLRA requires that an inmate plaintiff who wishes to pursue claims based on conditions of confinement first "complete the administrative review process in accordance with the applicable procedural rules[.]" *Woodford*, 548 U.S. at 88. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Bock*, 549 U.S. at 218. Under Ohio's grievance procedure,

> [i]nformal complaints and grievances must contain specific
> information; dates, times, places, the event giving rise to

12

> the complaint and, if applicable, the name or names of
> personnel involved and the name or names of any witnesses.
> Specificity of the complaint provides institutional staff
> the opportunity to investigate the complaint and to take
> corrective action to address a valid complaint.

O.A.C. § 5120-9-31(K). "[T]he primary purpose of a grievance is
to alert prison officials to a problem, not to provide personal
notice to a particular official that he may be sued[.]'" *Bock*,
549 U.S. at 219 (internal quotation marks and citations omitted).
*See also Lee v. Eddy*, No. 2:13-cv-87, 2014 U.S. Dist. LEXIS
17920, at *21-22 (S.D. Ohio Feb. 12, 2014) (concluding that
inmate plaintiff had exhausted his administrative remedies where
a review of the plaintiff's grievance forms "would have alerted"
the defendant to the subject of the grievance and where the
defendant "was provided ample opportunity to address plaintiff's
complaint if he chose to do so"), *adopted and affirmed by Lee v.
Eddy*, No. 2:13-cv-87, 2014 U.S. Dist. LEXIS 137334, at *10-13
(S.D. Ohio Sept. 29, 2014).

After reviewing the grievance records, which have been
filed under seal and therefore will not be recounted at length
here, *see* ECF 62-5, the Court is first persuaded that defendant
was put on notice that he was the subject of the grievances
actually filed by plaintiff. Defendant is correct that plaintiff
alleged at times that it was "Central Office" that denied certain
courses of treatment recommended by defendant. However,
plaintiff also complained that the doctors, including defendant,
were aware of his medical issues and medical needs, but
nevertheless failed to resolve the issues or to properly treat

13

him. *See*, *e.g.*, ECF 62-5, PAGEID#:625, 631-32, 637, 643-44. Moreover, the grievance records make clear that defendant, PCI's Chief Medical Officer, agreed with Collegial Review's decision to authorize alternative treatment plans, a decision that plaintiff later appealed. *See generally* ECF 62-5. Viewing this record as a whole, this Court cannot find that "[p]laintiff's grievances did not put Dr. Hale on notice of his complaints because Dr. Hale was not the subject of Plaintiff's grievances." *Reply*, p. 3. *Cf*. *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) (stating that a defendant has the burden of pleading and proving the affirmative defense of failure to exhaust administrative remedies).

However, the Court is not persuaded that plaintiff exhausted his administrative remedies in connection with his transfer from FHC, the denial of a wheelchair, and inaccessible meals. Plaintiff insists that defendant is estopped from arguing that these claims are not exhausted because the Chief Inspector's final decisions included a full consideration of plaintiff's medical conditions, including these allegedly unexhausted claims. *Memo. in Opp.*, p. 13 (citing *Reynolds-Bey v. Harris-Spicer*, No. 09-1472, 428 F. App'x 493, at *502 (6th Cir. Apr. 13, 2011) (quoting *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010)). In *Reed-Bey*, the United States Court of Appeals for the Sixth Circuit commented that, "[w]hen prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule

14

will we." *Id.* at 325. In *Reed-Bey*, the Sixth Circuit concluded that the inmate plaintiff had "properly exhausted his claim because he invoked one complete round of the Department's grievance procedures and received merits-based responses at each step." *Id*.

However, the Sixth Circuit has cautioned in more recent cases that "[s]imply mentioning that the prison reviewed the record does not a merits-based response make. . . . For *Reed-Bey*'s holding to apply [the inmate plaintiff] would have had to receive 'merits-based responses *at each step*.'" *Cook v. Caruso*, No. 11-1454, 531 F.App'x 554, at *563 (6th Cir. July 29, 2013) (quoting *Reed-Bey*, 603 F.3d at 325) (emphasis added in *Cook*). It follows, then, that an inmate-plaintiff's claim is not exhausted where the plaintiff has not received a merits-based response at each step of the administrative process. *Id.; Lee v. Willey*, 789 F.3d 673, 680-81 (6th Cir. 2015) (affirming district court's conclusion that inmate plaintiff failed to exhaust his administrative remedies where he did not receive a merits-based response at each step).

In the case presently before the Court, plaintiff did not complain of his transfer from FHC, the denial of a wheelchair, or inaccessible meals at any of the three steps in the grievance process. *See* ECF 62-5, PAGEID#:625, 631-32, 637, 643-44. *See also Parks Affidavit*, ¶¶ 9-10. The Chief Inspector referred to these matters only in recounting plaintiff's medical history. ECF 62-5, PAGEID#:623 (excerpt from Decision of the Chief Inspector

15

on a Grievance Appeal addressing PCI-09-12-000049). *See also* ECF
62-5, PAGEID#:635 (excerpt from Decision of the Chief Inspector
on a Grievance Appeal addressing PCI-09-12-000050) ("I also
reviewed appeal # PCI-09-12-000049. Please refer to the details
of that response to my answer to this current complaint."). The
Chief Inspector went on to state that "[m]y response, after
review of the above information, is that the medical staff at
your facility is giving you the proper care within the ODRC
guidelines." ECF 62-5, PAGEID#:623. Plaintiff received no other
merits-based response to these issues at the other two stages of
the grievance process. *See generally* ECF 62-5. On this record,
the Court must conclude that plaintiff failed to exhaust his
administrative remedies as to any claims based on his transfer
from FHC, the denial of a wheelchair, and inaccessible meals.
*See Willey*, 789 F.3d at 680-81; *Cook*, 531 F.App'x 554, at *563;
*Reed-Bey*, 603 F.3d at 325.

## IV.  EIGHTH AMENDMENT

Plaintiff has, however, exhausted certain of his claims: the
alleged denial of a neurology clinic evaluation for his Type I Chiari
Malformation, the alleged denial of an orthotics clinic consult to
adjust his knee braces, the alleged discontinuation of ESIs, and the
alleged denial of glucosamine.[11] As to these allegations, plaintiff
claims that defendant was deliberately indifferent to plaintiff's

---

[11] The *Amended Complaint* alleges that plaintiff "has not had any sessions of
physical therapy[.]" *Amended Complaint*, ¶ 20. Plaintiff later admits,
however, that he "began physical therapy" and does not otherwise argue that
he has been denied access to physical therapy. *Memo. in Opp.*, p. 9. Based
on this record, plaintiff has apparently abandoned his claim in connection
with physical therapy.

serious medical needs in violation of plaintiff's rights under the
Eighth Amendment, which prohibits cruel and unusual punishment.

In order to prevail on these claims, plaintiff must prove that
defendant acted with "deliberate indifference to [his] serious medical
needs." *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). This standard
includes both an objective and a subjective component. The objective
component requires that a plaintiff establish the existence of a
"sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825,
834 (1994). The subjective component requires that a plaintiff
establish that the "official being sued subjectively perceived facts
from which to infer substantial risk to the prisoner, that he did in
fact draw the inference, and that he then disregarded that risk."
*Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*,
511 U.S. at 837). However, "a plaintiff need not show that the
official acted 'for the very purpose of causing harm or with knowledge
that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835).
"Instead, 'deliberate indifference to a substantial risk of serious
harm to a prisoner is the equivalent of recklessly disregarding that
risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 836). This component
therefore requires more than "mere negligence, but less than 'acts or
omissions for the very purpose of causing harm or with knowledge that
harm will result.'" *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th
Cir. 2005) (quoting *Farmer*, 511 U.S. at 835).

For instance, "[w]hen a prison doctor provides treatment, albeit
carelessly or inefficaciously, to a prisoner, he has not displayed a
deliberate indifference to the prisoner's needs, but merely a degree

of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 F.3d at 703.  Nevertheless, a prison doctor "'has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm.'" *Santiago*, 734 F.3d at 591 (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)).  *See also Estelle*, 429 U.S. at 104 n.10 (citing as an example of deliberate indifference where a prison physician chooses "the easier and less efficacious treatment").  Finally, although a difference of opinion between a prisoner and prison health care providers, or a dispute over the adequacy of a prisoner's treatment, may constitute medical malpractice, that difference or dispute is not sufficient to state a claim for deliberate indifference under the Eighth Amendment.  *Id*. at 106; *Apanovitch v. Wilkinson*, No. 01-3558, 32 F. App'x 704, at *707 (6th Cir. Feb. 5, 2002) (granting summary judgment to defendants where medical records showed that prison provided plaintiff with orthopedic devices, prescribed pain killers, and ordered diagnostic tests).

### A.    Neurology Clinic Evaluation

Plaintiff has been diagnosed with a Type I Chiari Malformation, which is "a structural defect in the cerebellum, the part of the brain that controls balance." *Eddy Affidavit*, ¶ 8.  On July 25, 2012, shortly after he arrived at PCI, plaintiff underwent an MRI of the brain.  ECF 62-8 (copy of MRI results).  Imaging was consistent with a Type I Chiari Malformation, but revealed no acute abnormality:

> Diffusion weighted imaging demonstrates no evidence of
> acute abnormality.  There is inferior herniation of the

inferior cerebellar tonsils through the foramen magnum
inferiorly measuring approximately 9 mm in the craniocaudal
dimension consistent with a Chiari type one malformation.
The ventricular system is normal in size.  No
intraparenchymal signal abnormality is seen.  No abnormal
extra axial fluid collection or mass effect is
demonstrated.  No significant abnormal enhancement is seen
on post contrast imaging.  Normal flows are evident within
the intracranial internal carotid and basilar arteries
implying gross patency.

\*                     \*                    \*

No evidence of hydrocephalous.

*Id*. at 1.  On July 27, 2012, defendant shared the MRI results with

plaintiff, ECF 62-6, pp. 3-4, and explained that plaintiff's symptoms

related to hydrocephaly, but that that condition was not evident on

the MRI.  *Id*.  Defendant also explained that symptoms of Type I Chiari

Malformation are pain or headaches, which are secondary to

hydrocephaly.  *Id*. at 4.

Because he wanted to ensure that plaintiff's condition did not

progress, defendant recommended a neurological examination. *Deposition

of Arthur Hale*, ECF 61, pp. 90-91 ("*Hale Deposition*").  On August 22,

2012, however, the Collegial Review concluded that declined to

authorize the examination because plaintiff's condition was "stage I

at this time[.]"  ECF 62-6, p. 10.

Plaintiff apparently underwent a neurology consult for his Type I

Chiari Malformation sometime later.  *Hale Deposition*, p. 87. Plaintiff

complains that "it took over a year for Defendant to submit a request

for Mr. Swank to be seen by a neurologist" for evaluation of his Type

I Chiari Malformation.  *Memo. in Opp*., p. 10.  When an inmate-

plaintiff alleges a delay in treatment, "the plaintiff must 'place

verifying medical evidence in the record to establish the detrimental

effect of the delay in medical treatment'" in order to establish the objective prong of a deliberate indifference claim. *Santiago v. Ringle*, 734 F.3d 585 (6th Cir. 2013)(quoting *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)). *See also King v. Alexander*, No. 13-4287, 574 F.App'x 603, at *606 (6th Cir. July 25, 2014) ("[Plaintiff's] failure to provide medical expert testimony to establish a causal link between her injury and the allegedly inadequate treatment thus dooms her deliberate-indifference claim.").

When evaluated by reference to this standard, plaintiff's claim that "it took over a year for Defendant to submit a request for Mr. Swank to be seen by a neurologist" is deficient for a number of reasons. First, defendant requested a neurology consult a little more than one month after plaintiff was transferred to PCI on July 17, 2012. *See*, *e.g.*, ECF 62-6, p. 10 (reflecting that Collegial Review discussed defendant's request for neurology evaluation for plaintiff's Type I Chiari Malformation on August 22, 2012). The record therefore does not support plaintiff's representation that "it took *over a year* . . . *to submit a request*" for a neurology consult. *Memo. in Opp.*, p. 10 (emphasis added).

Even assuming a delay in requesting, or actually obtaining, a neurology evaluation, plaintiff offers no verifying medical evidence to establish a causal link between injury to him and the alleged delay. *See Santiago*, 734 F.3d at 590; *King*, 574 F.App'x at *606. Instead, plaintiff relies on defendant's testimony regarding plaintiff's condition and the need for a neurology consultation and additional monitoring. *See Memo. in Opp.*, pp. 10, 16 (citing *Hale*

*Deposition*, pp. 90-91).  However, that testimony is not evidence of injury to plaintiff as a result of any delay in obtaining a neurological evaluation; defendant testified that a neurology consultation was needed merely to monitor plaintiff's condition and to assure that the condition did not progress.  Indeed, defendant has provided uncontroverted medical evidence that plaintiff's Type I Chiari Malformation was the least serious form of the condition and did not require treatment at that time:

> Type I is the most common and least serious form of Chiari Malformation and does not cause symptoms in many patients. Surgery is the only treatment to correct a Chiari Malformation.  However, Inmate Swank's Type I Chiari Malformation did not have characteristics amenable to surgical intervention.

*Eddy Affidavit*, ¶ 8.

Although the reference is made by plaintiff in connection with his alleged spine pain, plaintiff also refers to the testimony of Kenneth Saul, D.O., another ODRC doctor at PCI, in arguing that plaintiff experienced unnecessary pain and suffering.  *See*, *e.g.*, *Memo. in Opp.*, pp. 17-18 (quoting *Deposition of Kenneth Saul, D.O.*, ECF 68, p. 88 ("*Saul Deposition*")).  Dr. Saul testified that that there was too great a delay in obtaining a neurological consult and that plaintiff suffered pain in the interim.  *Saul Deposition*, pp. 88-89.  Significantly, plaintiff does not allege that he suffered pain as a result of any delay in obtaining a neurology consult.  *See generally Plaintiff's Affidavit,* ECF 70-5.

Even assuming that there was delay and that plaintiff has established the necessary causal link between that delay and injury or harm to him, plaintiff has not shown that defendant recklessly

21

disregarded a substantial risk of serious harm to plaintiff.
Defendant testified that he would "not necessarily" attribute any
complaints of dizziness to plaintiff's Type I Chiari Malformation
because there are "multiple etiologies for . . . dizziness[.]"  *Hale
Deposition*, pp. 140-41.  He also testified that, had plaintiff
"started developing symptoms, then I would refer him to a specialist."
*Id*. at 114.  Defendant's testimony also reveals that plaintiff's need
to see a different specialist also impacted the scheduling of
plaintiff's neurological consult.  *Id*. at 244-45.  Moreover, Dr. Saul
testified that defendant was not responsible for any denial of, or
delay in, plaintiff's care:

> Q:   Right.  But I guess what I need to know is whether the
> delay is attributable to Dr. Hale?
>
> **A:   I don't think it's anything he did.**
>
> Q:   Are you aware of any time that he intentionally
> delayed treatment for Inmate Swank?
>
> **A:   No.**
>
> Q:   Are you aware of any time that he intentionally denied
> treatment for Inmate Swank?
>
> **A:   He never denied anything.**
>
> Q:   So he never denied any surgeries for Mr. Swank?
>
> **A:   No.**
>
> Q:   And he never denied any braces for Mr. Swank?
>
> **A:   He approved everything I sent in.**

*Saul Deposition*, p. 91 (emphasis in original).  In short, the
uncontroverted evidence before the Court establishes that defendant
planned to refer plaintiff to a neurologist if plaintiff developed
symptoms and that plaintiff, in fact, was referred to neurology in

22

coordination with his caring for plaintiff's other medical needs. Under these circumstances, plaintiff has not shown that defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703.  Accordingly, to the extent plaintiff bases a claim for deliberate indifference on an alleged delay in a neurology evaluation, this claim must fail.[12]

**B.  Orthotics Clinic Consult**

Plaintiff alleges that he "has not been given other medical equipment he desperately needs (e.g., adequate knee braces)" and that he "has been unable to consult with an orthopedic doctor who could assist him with treatment of his knee injuries[.]" *Amended Complaint*, ¶ 20.  Defendant apparently assumes for purposes of his *Motion* that plaintiff has satisfied the objective prong of his deliberate indifference claim in connection with this allegation, but argues that plaintiff has not established the subjective component of that claim. *Motion*, pp. 7, 12-15.  This Court agrees.

After plaintiff's arrival at PCI on July 17, 2012, defendant evaluated plaintiff in DSC on July 27, 2012.  ECF 62-6, p. 3. Defendant prescribed Tylenol for plaintiff's complaints of knee pain. *Id.*; ECF 62-7, p. 3 (copy of doctor's orders).  On August 2, 2012, defendant again saw plaintiff in DSC, recorded plaintiff's

---

[12] Plaintiff also contends that defendant consistently failed "to convey the serious medical needs of his patients" during the Collegial Review process. *Memo. in Opp.*, p. 17).  Even assuming any relevance of this contention to plaintiff's claims, the testimony upon which plaintiff relies, *Hale Deposition*, pp. 170-72, simply does not support this contention.

complaints of knee pain and swelling and noted findings of crepitus,[13] full range of motion, no effusion, no swelling, and a brace in place.  ECF 62-6, p. 5.  Defendant ordered an x-ray, *id.*, which revealed:

> [t]here are residual lucencies in the distal femur and proximal tibia from old ACL reconstruction.  No metallic hardware is present.  Joint spaces are intact.  Articular surfaces are smooth.  No acute fracture or dislocation.

ECF 62-9.

Plaintiff presented at DSC on August 7, 2012.  ECF 62-6, p. 6. Upon examination, defendant noted hinged knee braces, and findings of crepitus, tenderness to palpation at the medial joint line, and no laxity.  *Id.*  Defendant prescribed Nabumetone, an anti-inflammatory medication, and ordered that plaintiff's braces be maintained; defendant also scheduled a follow-up appointment in one week.  *Id.*; ECF 62-7, p. 3; *Hale Deposition*, p. 141-42.  On August 14, 2012, defendant examined plaintiff, who reported other medical concerns. ECF 62-6, pp. 7-8.

Progress notes from August 17, 2012 indicate that plaintiff asked defendant about "going to rec and gym."  *Id.* at 8.  Defendant approved the request because plaintiff was "stable."  *Id.*

A nurse who examined plaintiff on August 18, 2012, noted full range of motion in all four extremities, and that plaintiff ambulated without difficulty but occasionally used a cane because of back pain. *Id.* at 9.  Plaintiff also used a TENS unit as needed for pain.  *Id.*

---

[13] "Crepitus" "is 'the grating sensation caused by the rubbing together of the dry synovial surfaces of the joints[.]'"  *Bowman v. Astrue*, No. 1:07-CV-933, 2009 U.S. Dist. LEXIS 32385, at *3-4 n.2 (S.D. Ohio Apr. 16, 2009) (citations omitted).

On August 22, 2012, defendant requested a consultation with the Orthotics Clinic for evaluation of his braces "due to poor fit[.]" ECF 62-5.  *See also* ECF 62-7, p. 5.  On that same day, defendant discussed this request with Collegial Review, which approved the consult request.  ECF 62-6, p. 10.  Defendant advised plaintiff that the request for consultation with the Orthotics Clinic had been approved; defendant also relayed the results of the x-ray taken on August 2, 2012, explaining that the film had revealed no acute fracture or dislocation.  *Id*. at 12.

On September 5, 2012, the Collegial Review authorized new knee braces to be acquired from a site available to ALPs.  *Id*.; ECF 62-7, p. 6.  Plaintiff presented to DSC with complaints of knee pain on September 11, 2012.  ECF 62-6, p. 13.  On examination, it was noted that plaintiff had been "fitted for new braces last week."  *Id*. Examination revealed no laxity or swelling.  *Id*.  Plaintiff was prescribed Nabumetone for the ensuing thirty days.  *Id*.

This recitation reflects that defendant was not deliberately indifferent to plaintiff's knee condition.  Defendant examined and met with plaintiff on several occasions, ordered an x-ray, recommended a course of care based on plaintiff's symptoms and complaints, and discussed these issues with plaintiff.  Defendant prescribed anti-inflammatory medication and recommended that Collegial Review approve a consult with the Orthotics Clinic to adjust plaintiff's braces. Defendant later discussed this issue again with Collegial Review, which then concluded that new braces should be obtained through the ALP site.  Based on this record, plaintiff has not established that

defendant recklessly disregarded a substantial risk of serious harm in connection with plaintiff's knee condition. *See*, *e.g.*, *Comstock*, 273 F.3d at 703.

Plaintiff appears to challenge the adequacy of defendant's care in this regard. However, any dispute over the adequacy of defendant's care is simply not sufficient to establish a claim for deliberate indifference under the Eighth Amendment. *See Estelle*, 429 U.S. at 106; *Apanovitch,* 32 F. App'x 704, at *707. *See also Boynton v. Henderson-Pero*, No. 14-13846, 2015 U.S. Dist. LEXIS 119902, at *16-18 (E.D. Mich. Aug. 6, 2015) (rejecting inmate plaintiff's assertion that defendant doctor "was deliberately indifferent because she refused to refer him to an off-site specialist," finding that "these facts merely present a difference of medical opinion"), *adopted and affirmed by*, *Boynton v. Henderson-Pero*, No. 14-13846, 2015 U.S. Dist. LEXIS 118947 (E.D. Mich., Sept. 8, 2015); *Jones v. Benitez*, No. 15-2082, 2015 U.S. Dist. LEXIS 81855, at *20 (W.D. Tenn. June 24, 2015) ("The failure to approve a consultation with a specialist does not establish deliberate indifference. 'A medical decision not to order an X-ray, or like measures, does not represent cruel or unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court.'") (quoting *Estelle*, 429 U.S. at 107).

C. **Discontinuation of ESIs**

ESIs were provided to plaintiff prior to his transfer to PCI but, upon his transfer, plaintiff was advised that these injections would no longer be administered. *Memo. in Opp.*, pp. 3 n.3, 4. As discussed *supra*, defendant concedes that plaintiff exhausted his administrative

26

remedies as to the discontinuation of ESIs at the OSU pain clinic. However, as defendant correctly observes, the *Amended Complaint* does not complain about the discontinuation of these injections. Moreover, other than complaining generally that his care at PCI was deficient, plaintiff does not explain how discontinuation of ESIs amounted to deliberate indifference. *See generally id*. A review of the record confirms that any Eighth Amendment claim based on the discontinuation of these injections is unavailing.

ESIs at the OSU pain clinic had been recommended for plaintiff. *Eddy Affidavit*, ¶ 6. However, Dr. Eddy, whose testimony is uncontroverted, avers that OSU was no longer able to provide these ESIs, which, in any event, do not provide permanent relief and carry risks of infection and paralysis:

> 6.    . . . The ODRC maintains a contract with OSU for various specialty clinics. Beginning in approximately August of 2012, the physician who had been providing epidural steroid injections as part of the pain clinic was no longer working for OSU, and OSU was not able to provide this service to patients.
>
> 7.    OSU's lapse in the ability to provide epidural steroid injections aside, this treatment does not provide permanent relief for back pain or any other long-term benefits. At most it provides a few months of relief, but it carries a significant risk of infection and paralysis. The risks greatly outweigh the benefits, so even now that OSU has resumed providing this service, the ODRC does not prescribe it for inmates and has not sought another outside provider. The same benefits can be obtained through conservative management, which includes exercise and analgesic medication.

*Eddy Affidavit*, ¶¶ 6-7.

On August 14, 2012, plaintiff was seen in DSC and was advised that ESI treatment at the OSU pain clinic was no longer available.

ECF 62-6, pp. 7-8.[14]  Plaintiff was further advised that Collegial Review had directed that plaintiff's pain be managed conservatively with pain medication.  *Id.* at 8; *Hale Deposition*, pp. 110-11. Plaintiff voiced his understanding and agreed with that plan.  ECF 62-6, p. 8.

On August 22, 2012, defendant discussed ESIs with Collegial Review, which again noted that ESIs were no longer available and recommended conservative pain management.  ECF 62-6, p. 10.  Defendant advised plaintiff of this decision on August 28, 2012.  *Id.* at 11. Defendant also continued to prescribe Nabumetone.  *Id.*; *Hale Deposition*, pp. 117-18; ECF 62-7, p. 6.

Considering this record as a whole, the Court is not persuaded that plaintiff has shown that defendant was deliberately indifferent when plaintiff's ESIs were discontinued.

### D.   Denial of Glucosamine Prescription

The *Amended Complaint* does not assert a separate claim based on the denial of a prescription for glucosamine, and the *Memo. in Opp.* makes only a passing reference to glucosamine.[15] *Memo. in Opp.* pp. 18-19.  It therefore appears that plaintiff has abandoned a deliberate indifference claim based on the denial of glucosamine, even assuming that such a claim was ever asserted in this action.

Indeed, the present record does not establish that defendant was deliberately indifferent in this respect.  On August 2, 2012,

---

[14] Plaintiff was apparently seen by a physician other than defendant.  *See id*.
[15] However, plaintiff's contention with respect to glucosamine is not entirely clear: "[A]ssuming that Mr. Swank has demonstrated that no material issue of fact remains regarding  . . . the denial of a prescription for glucosamine[,] Mr. Swank has nonetheless failed to move for summary judgment as to all other aspects of Mr. Swank's medical care."  *Memo. in Opp.* pp. 18-19.

defendant electronically submitted a request for 500 milligrams of glucosamine three times a day for plaintiff.  ECF 62-11; *Eddy Affidavit*, ¶ 4.  In support of his request, defendant explained that plaintiff had a "history of degenerative disc disease in lower back seen on MRI from 3/12."  ECF 62-11.  Dr. Eddy denied defendant's request for glucosamine:

> 5.  Glucosamine is a non-formulary dietary supplement available over-the-counter and promoted by some to treat musculoskeletal disorders.  Non-formulary medications must be approved by my office before they can be prescribed.  Glucosamine has not been clinically shown to be any more effective than a placebo in the treatment of degenerative disc disease and low-back pain.  I denied the PA for glucosamine as not medically necessary and noted that Inmate Swank may purchase it from the commissary.  At that time, a 60-count bottle of 500 mg glucosamine tablets from the commissary cost $4.48.

*Eddy Affidavit*, ¶ 5.  Collegial Review discussed glucosamine for plaintiff on August 22, 2012 and concluded that the prescription was not medically necessary.  ECF 62-6, p. 10.

This record reflects that defendant did not disregard a risk of serious harm to plaintiff.  Instead, defendant requested glucosamine, but Dr. Eddy and Collegial Review concluded that the prescription was not medically necessary.  To the extent that plaintiff wishes to hold defendant liable for Dr. Eddy's denial of glucosamine, liability based on a theory of *respondeat superior* is not cognizable under § 1983. *See Turner v. City of Taylor*, 412 F.3d 629, 643 (6th Cir. 2005); *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982).  Moreover, plaintiff continued to be treated with conservative pain management.  Under these circumstances, defendant was not deliberately indifferent because Dr. Eddy denied the request for glucosamine and recommended a

different form of treatment.

**E. Kenneth Saul, D.O., and Spine Pain**

Plaintiff generally argues that his "treatment only progressed when another physician, Dr. Saul, arrived at PCI and began treating Mr. Swank." *Memo. in Opp.*, p. 17. Plaintiff goes on to specifically argue that Dr. Saul, not defendant, scheduled the testing and specialty consult necessary to assess and treat the deterioration of plaintiff's spine. *Id.* at 17-18. Plaintiff contends that defendant's failures in this regard amounted to deliberate indifference and resulted in unnecessary pain and suffering. *Id.* at 18 (citing *Saul Deposition*, pp. 88-89).

As noted *supra*, there is no evidence that plaintiff exhausted his administrative remedies as to this claim; indeed, it is not clear that plaintiff even alleged such a claim in the *Amended Complaint*. In any event, Dr. Saul's testimony does not establish that defendant was deliberately indifferent to plaintiff's serious medical needs. Dr. Saul testified that defendant neither delayed nor denied care to plaintiff. *Saul Deposition*, p. 91. Accordingly, plaintiff's general assertions in this regard are insufficient to establish a claim of deliberate indifference.

**WHEREUPON**, it is **RECOMMENDED** that *Defendant's Motion for Summary Judgment*, ECF 62, be **GRANTED**.

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*,

specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


November 16, 2015                          *s/Norah McCann King*
                                          Norah McCann King
                                     United States Magistrate Judge