**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **AARON SWANK,** | : | |
| | : | **Case No. 2:12-cv-1031** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | |
| **DR. ARTHUR HALE,** | : | **Magistrate Judge King** |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter comes before the Court on Plaintiff Aaron Swank's Objections (Doc. 78) to the Magistrate Judge's November 16, 2015 **Report and Recommendation** (Doc. 77), recommending that this Court grant Defendant Dr. Arthur Hale's Motion for Summary Judgment. Upon independent review by the Court, and for the reasons set forth below, Swank's Objections are **OVERRULED**. Accordingly, the Court hereby **ACCEPTS** and **AFFIRMS** the Magistrate Judge's **Report and Recommendation**, thereby **GRANTING** Summary Judgment to Dr. Hale on Swank's deliberate indifference claim.

## I. BACKGROUND

### A. Factual Background

Magistrate Judge King fully set forth the facts in her November 16, 2015 Report and Recommendation. (Doc. 77, PageID 929-33). Neither party contested the Magistrate Judge's summary of the facts. Accordingly, this Court adopts that recitation of the facts its entirety. In short, this is a civil rights action under 42 U.S.C. § 1983 in which Swank, a state prisoner, alleges that Dr. Hale, the Chief Medical Officer at his facility of detention, was deliberately indifferent to Swank's serious medical needs in violation of the United States Constitution.

### B.  Procedural Background

On November 13, 2012, Aaron Swank, an inmate at the Pickaway Correctional Institution ("PCI"), filed this action under § 1983 against Dr. Arthur Hale, PCI's Chief Medical Officer.  (Doc. 4).  Swank later amended his Complaint and alleged that Dr. Hale was deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the Constitution.  (Doc. 31).  Dr. Hale then moved for summary judgment. (Doc. 62).  On November 16, 2015, the Magistrate Judge issued a Report and Recommendation recommending that Dr. Hale's Motion for Summary Judgment be granted, finding that Swank failed to exhaust several grievances and that no genuine dispute as to any material fact existed as to the remaining, properly exhausted issues.  (Doc. 77).  On December 3, 2015, Swank filed objections to the Report and Recommendation.  (Doc. 78).  Dr. Hale declined to file a response in opposition.  This matter is now ripe for review.

## II.  LEGAL STANDARDS

Upon objection to a magistrate judge's report and recommendation, this Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Only *specific* objections are entitled to de novo review.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (per curiam) ("The parties have the duty to pinpoint these portions of the Magistrate Judge's report that the district court must specially consider.").  After conducting this review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The Court "may also receive further evidence or recommit the matter to the magistrate judge with instructions."  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is proper only when "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." The movant bears the burden of proof on both points. *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001). In determining whether this standard is met, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013). In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quotation omitted).

## III. ANALYSIS

Swank objects to the Magistrate Judge's Report and Recommendation on the following grounds: (1) the recommendation erred by refusing to consider evidence relied upon in support of Swank's opposition to summary judgment; (2) the recommendation erred by finding that Swank did not exhaust all grievances alleged; (3) the recommendation erred by declining to estop Dr. Hale from defending against certain grievances based on Swank's failure to exhaust them; (4) consideration of the improperly excluded materials creates a genuine dispute of material fact, thereby precluding summary judgment; and (5) the recommendation erred in finding that Dr. Hale did not delay treatment for one of Swank's properly exhausted grievances and that, in any event, any delay did not harm Swank. In light of these arguments, Swank contends that the Magistrate Judge's recommendation of summary judgment in favor of Dr. Hale should be rejected. The Court will consider each of Swank's objections in turn before **GRANTING** Dr. Hale's Motion for Summary Judgment under the standards set forth above.

3

### A.  The Magistrate Judge Erred by Refusing to Consider Swank's Unauthenticated Medical Records, but that Error Was Harmless.

Swank first contends that the Magistrate Judge erred by refusing to consider prison records he submitted in connection with his opposition to Dr. Hale's Motion for Summary Judgment.  (*See* Doc. 77, PageID 929 n.2 ("Throughout his *Memo. in Opp.*, plaintiff relies on medical and prison records that have not been authenticated.  However, unauthenticated documents cannot be considered at the summary judgment stage." (citations omitted))).  According to Swank, the 2010 amendments to Federal Rule of Civil Procedure 56 eliminated any requirement that records in support of or in opposition to summary judgment be authenticated.  (*See* Doc. 78, PageID 970-73).

To be sure, the pre-2010 version of Rule 56 required that records relied on in support of or in opposition to a summary judgment motion must be authenticated through affidavit or declaration.  *See* Fed. R. Civ. P. 56(e)(1) (2009) ("If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit."); *see also Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible. . . . [U]nauthenticated documents do not meet the requirements of Rule 56(e)." (citations omitted) (quotation omitted)); *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006) (affirming district court's decision to disregard documents when deciding a dispositive motion where documents "were neither sworn nor certified, were not properly authenticated[,] and were therefore inadmissible in evidence").  The Magistrate Judge cited these cases, which interpreted the pre-2010 version of Rule 56, to exclude from her consideration an unauthenticated Exhibit that Swank filed in connection with his opposition to summary judgment.  (*See* Doc. 77, PageID 929 n.2 (excluding consideration of "Exhibit B," Doc. 72, PageID 799-907 [filed under seal])).

4

The 2010 amendments to Rule 56, however, eliminated former Subdivision (e) and replaced it with the more lenient Subdivision (c)(1)(A), which allows reliance on a variety of evidence (authenticated and unauthenticated) in support of or opposition to summary judgment:

> **(1) *Supporting Factual Positions*.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . . .

Fed. R. Civ. P. 56(c)(1)(A).

The Advisory Committee Notes to the 2010 amendments explain this more lenient standard as follows: "The requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record."  Fed. R. Civ. P. 56, Advisory Committee Notes to 2010 Amendments. In addition, the Advisory Committee Notes state that a party may either refer to materials already in the record, or may place such materials into the record by attaching them to the summary judgment motion.  *Id.* ("Subdivision (c)(1)(A) describes the familiar record materials commonly relied upon and requires that the movant cite the particular parts of the materials that support its fact positions.  *Materials that are not yet in the record*—including materials referred to in an affidavit or declaration—*must be placed in the record*." (emphasis added)).  The Local Rules for the Southern District of Ohio track this understanding by allowing the direct attachment of documents (without authentication) as permissible evidentiary support for summary judgment papers.  *See* S.D. Ohio Civ. R. 7.2(e) (discussing "Memoranda Evidence," including "other documentary or electronic exhibits").

Lower courts throughout this Circuit recognize that the 2010 amendments eliminated Rule 56's pre-2010 authentication standard. *See Smith v. Interim HealthCare of Cincinnati, Inc.*, No. 1:10-cv-582, 2011 WL 6012971, at *4 (S.D. Ohio Dec. 2, 2011) ("The 2010 amendments to Rule 56 allow a party making or opposing summary judgment to cite materials in the record. . . . If a party believes that such materials cannot be presented in a form that would be admissible in evidence,' that party may file an objection." (quotation omitted)); *see also Pawlaczyk v. Besser Credit Union*, No. 1:14-cv-10983, 2015 WL 4208649, at *8 (E.D. Mich. Apr. 13, 2015) ("[T]he new Rule has jettisoned the authentication requirement."); *ForeWord Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011) ("[T]he amendment replaces a clear, bright-line rule ('all documents must be authenticated') with a multi-step process by which a proponent may submit evidence, subject to objection by the opponent and an opportunity for the proponent to either authenticate the document or propose a method to doing so at trial.").

This Court agrees with Swank that Rule 56 (as amended) replaces the authentication standard and permits courts to consider unauthenticated materials, while providing an adverse party the opportunity to object to material that the party believes "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Importantly, "the objection contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but[,] [rather,] that it 'cannot be.'" *ForeWord Magazine*, 2011 WL 5169384, at *2. This objection "functions much as an objection at trial, adjusted for the pretrial setting." *See* Fed. R. Civ. P. 56, Advisory Committee Notes to 2010 Amendments (explaining that "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated").

There is no indication that Dr. Hale objected to Swank's reliance on the records contained in "Exhibit B" (Doc. 72).  Dr. Hale never mentioned those materials in his Reply Brief.  (*See* Doc. 76).  Rather, it seems that the Magistrate Judge refused to consider the records sua sponte, without providing Swank an opportunity to show that they could be admissible at trial.  Under these circumstances, it was inappropriate to refuse consideration of Swank's unauthenticated records.  *See Pawlaczyk*, 2015 WL 4208649, at *8-9 (tracing evolution of Rule 56 and considering unauthenticated documents because adverse party "has not objected to them"; "Now, the materials come in first . . . then the court considers their admissibility when a party raises the issue."); *Foreword Magazine*, 2011 WL 5169384, at *2 ("The revised Rule therefore clearly contemplates that the proponent of evidence will have the ability to address the opponent's objections, and the Rule allows the court to give the proponent 'an opportunity to properly support or address the fact,' [even] if the court finds the objection meritorious." (quoting Fed. R. Civ. P. 56(e)(1))).

Upon de novo review, it seems that Swank easily could have allayed any concerns over the records' admissibility at trial.  The excluded materials are medical and prison records created and reviewed by Dr. Hale or other staff employed by PCI, and thus, can be authenticated through those individuals or a document custodian from the Ohio Department of Rehabilitation and Correction.  Indeed, these very records were included as exhibits to the depositions of Dr. Hale and Dr. Saul.  (*See* Doc. 61 at PageID 401 [Dr. Hale Dep. at 97:19-98:3]; Doc. 68 at PageID 715 [Dr. Saul Dep. at 93:15-24]).

As explained below, however, the Magistrate Judge's refusal to consider these records constituted harmless error.  This Court's independent consideration of the records does not save Swank's deliberate indifference claim from summary judgment.

### B. Swank Failed to Exhaust Several Grievances Underlying his Deliberate Indifference Claim as Required Under the Prison Litigation Reform Act.

Swank next contends that the Magistrate Judge erred in finding that he failed to exhaust Ohio's three-step administrative grievance process before filing this § 1983 action, thus dooming his deliberate indifference claim insofar as it relates to several allegations of improper care. (*See* Doc. 77, PageID 935-42). More specifically, the Magistrate Judge concluded that Swank failed to exhaust the available administrative remedies as to three allegations: (1) "his transfer from FHC" (the Frazier Health Center—a long-term care facility housed within PCI); (2) "the denial of a wheelchair"; and (3) "inaccessible meals." (*Id.* at PageID 942, 944).

The Prison Litigation Reform Act ("PLRA") prevents a prisoner from filing suit "with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). To satisfy this exhaustion requirement, prisoners must "complete the administrative review process in accordance with the applicable procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Non-exhaustion is an affirmative defense, with the burden of proof falling on the defendant, *Jones v. Bock*, 549 U.S. 199, 216 (2007), but the exhaustion requirement is "mandatory," not discretionary, and "must be enforced by the district court," *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005).

Swank's claim thus must comply with Ohio's three-step "inmate grievance procedure," which consists of the following consecutive steps: (1) the filing of an informal complaint; (2) the filing of a notification of grievance; and (3) the filing of an appeal of the disposition of grievance. O.A.C. § 5120-9-31(K)(1)-(K)(3). This procedure is intended to "address inmate complaints related to any aspect of institutional life that directly and personally affects the grievant," including "complaints regarding policies, procedures, conditions of confinement, or the actions of institutional staff." *Id.* § 5120-9-31(A).

The parties agreed below that Swank properly exhausted two prisoner grievances, PCI-09-12-000049 and PCI-09-12-000050, which raised complaints about four specific courses of treatment (or lack thereof): (1) denial of a neurology clinic evaluation for his Type I Chiari Malformation; (2) denial of an orthotics clinic consult to adjust his knee braces; (3) discontinuation of epidural steroid injections at the OSU pain clinic; and (4) denial of a prescription for the non-formulary medication glucosamine.  (*See* Doc. 77 at PageID 938).

The parties disputed whether Swank exhausted the available remedies as to *other* alleged denials of care, including allegations regarding his transfer from FHC, denial of the use of a wheelchair, and inaccessible meals.  (Doc. 77 at PageID 939).  Swank does not contend that he submitted these other allegations to the inmate grievance process with any particularity.  Rather, he argues that his "use of the grievance process put [Dr. Hale] on fair notice regarding the inadequacy of [his] medical care" more generally.  (Doc. 78 at PageID 974).  According to Swank, "[r]equiring an inmate . . . to specifically identify each and every condition, diagnosis, requested treatment, and denial of care would make exhaustion an insurmountable requirement for most every inmate."  (*Id.* at PageID 975 (arguing for a "notice pleading" standard)).

In short, Swank's exhaustion objection hinges on the specificity required for filing a prison grievance—that is, the extent to which a grievance must specify each discrete event complained of.  Courts have interpreted the PLRA's exhaustion requirement to mean that a prisoner must "complete the administrative review process in accordance with the applicable rules, as defined *not* by the PLRA, *but by the prison grievance process itself.*"  *Lee v. Wiley*, 789 F.3d 673, 677 (6th Cir. 2015) (emphasis added) (brackets, ellipsis, and quotations omitted).  In other words, this Court must look to Ohio's inmate grievance requirements to determine whether Swank complied with them by specifically listing his allegations.

Unfortunately for Swank, Ohio's inmate grievance procedure requires more particularity than he provided in his informal complaints and grievances.  Under that procedure, "[i]nformal complaints and grievances"—which form the first two steps of the process—"must contain *specific information*[,] [including] dates, times, places, *the event giving rise to the complaint* and, if applicable, the name or names of personnel involved and the name or names of any witnesses." O.A.C. § 5120-9-31(K) (emphasis added).  This specificity requirement "provides institutional staff the opportunity to investigate the complaint and to take corrective action."  *Id.*  And while Ohio permits "John/Jane Doe" complaints where the identity of the personnel involved remains unknown, "the complaint *shall be specific as to* dates, times, places, physical descriptions of any unidentified personnel, and *the actions of said personnel giving rise to the complaint*."  *Id.* (emphasis added).

This Court generally "enforce[s] that regulation as written."  *See King v. Banks*, No. 2:10-cv-852, 2012 WL 2891264, at *1 (S.D. Ohio July 13, 2012) (Marbley, J.) (collecting cases) (adopting report and recommendation and granting summary judgment to defendants due to lack of specificity in inmate grievances); *see also, e.g.*, *Quinn v. Eshem*, No. 1:13-cv-864, 2015 WL 9951611, at *7-12 (S.D. Ohio Nov. 13, 2015) (evaluating allegations on an incident-by-incident basis to determine if prisoner exhausted Ohio's three-step grievance procedure despite the fact that all three incidents occurred within two-week span and generally alleged abuse of force/harassment), *Rep. & Recommendation affirmed*, 2016 WL 393677 (S.D. Ohio Feb. 2, 2016); *Collins v. Warden, London Corr. Inst.*, No. 2:12-cv-1093, 2014 WL 1653130, at *7 (S.D. Ohio Apr. 23, 2014) (evaluating deliberate indifference claim on treatment-by-treatment basis to determine if prisoner properly exhausted claim as to denial of asthma treatment), *Rep. & Recommendation affirmed*, 2014 WL 2207706 (S.D. Ohio May 28, 2014).

So too does the Sixth Circuit. For example, in *Kramer v. Wilkinson*, 302 F. App'x 396, (6th Cir. 2008), the court held that an inmate was "barred by [the] PLRA from proceeding" on a claim "arising from a specific instance of forcibly administer[ing] [the drug] Haldol" because "[n]one of the three grievances [he] fully pursued through the prison system's grievance process—*regarding the general practice of involuntary medication*, favoritism in job assignments, and the law library equipment—plausibly included this specific incident," *id.* at 399 (emphasis added). The Sixth Circuit revisited the issue of specific versus generalized prison complaints just last year in *Siggers v. Campbell*, 652 F.3d 681 (6th Cir. 2015). There, corrections officials issued prison-mail rejections on September 12, 15, and 29, 2006, and then again on March 9, 2007. *Siggers*, 652 F.3d at 688-89. The prisoner complained that the officials violated his rights by rejecting his incoming mail. *Id.* at 684. The district court held that the prisoner's September 16, 2006 grievance was sufficient to exhaust only the claims relating to the September 12, 2006 mail rejection. *Id.* at 690. On appeal, the prisoner argued that the district court erred in holding that he was required to file individual grievances challenging each mail rejection. *Id.* at 691. According to the prisoner, the September 16, 2006 grievance, which addressed only the September 12, 2006 mail rejection, put the defendants on notice of a continuing violation and was, therefore, sufficient to exhaust claims of harm caused by all subsequent mail rejections. *Id.* at 692. The *Siggers* Court disagreed, explaining as follows:

> [The prisoner] was not suffering from one, continuing harm and government indifference. Rather, the Notices of mail rejection that [the prisoner] identifies are each discrete events, and each Notice involves separate facts and circumstances—and even different policy directives. Furthermore, a grievance on each would have permitted an investigation into the reasons for each rejection, based on the different contents of each rejected piece of mail. . . . We therefore affirm the district court's holding that [the prisoner] failed to exhaust all of this mail-rejection claims except for that based on the September 12, 2006 Notice.

*Id.* at 693.

So too, here.  Like the denial of asthma treatment in *Collins*, the forced administration of Haldol in *Kramer*, and the specific mail rejections in *Siggers*, the alleged denials of care at issue here, including Swank's transfer from FHC, the denial of use of a wheelchair, and the requirement that he ambulate to the dining hall, are each discrete events.  Those events involved separate facts and circumstances (and quite possibly, separate actors), and, presumably, different reasoning (like the different policy directives in *Siggers*) underlay each alleged denial of care.  Swank was not, as he argues, suffering from one continuing harm.

Therefore, the two exhausted grievances, which raised complaints about four specific courses of treatments, did not properly place Dr. Hale on notice of the *other* alleged denials of care.  For example, placing Dr. Hale on notice about the denial of a neurology clinic evaluation for Swank's Type I Chiari Malformation did not likewise provide Dr. Hale with notice that he allegedly and improperly denied the use of a wheelchair.  By failing to utilize the three-step inmate grievance procedure with regard to *all* alleged denials of care, Swank failed to exhaust his claim insofar as he bases it on those unexhausted allegations.  Put simply, if Swank felt aggrieved by being transferred out of FHC, being denied a wheelchair, having to ambulate to receive his meals, or other decisions, he should have filed a grievance so stating.  The Magistrate Judge, therefore, did not err in limiting the scope of Swank's exhausted claims.[1]

---

[1] In sum, Swank properly exhausted his claim with respect to four courses of treatment: (1) denial of a neurology clinic evaluation for his Type I Chiari Malformation; (2) denial of an orthotics clinic consult to adjust his knee braces; (3) discontinuation of steroid injections at the OSU pain clinic; and (4) denial of the prescription drug glucosamine.  (*See generally* Doc. 62-5, PageID 619-44 [prison grievance records]).

Swank failed to exhaust his claim with respect to other alleged denials of care.  Some of those unexhausted allegations *first* appeared in Swank's Amended Complaint—namely: (1) his transfer from FHC (Doc. 31, ¶ 15); (2) the denial of a wheelchair (*id.* at ¶¶ 16, 17, 18, 20); (3) inaccessible meals (*id.* at ¶¶ 16, 20); and (4) the denial of physical therapy sessions (*id.* at ¶ 20).  Others, including the lack of an MRI (*id.* at ¶ 20), first appeared during the third and final step of Ohio's inmate grievance process, (Doc. 62-5, PageID 637 [Appeal to the Chief Inspector in PCI-09-12-000050]).  Regardless, all of these allegations are barred due to Swank's failure to "tak[e] advantage of each step the prison holds out for resolving the claim internally."  *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010).

### C.  Dr. Hale Is not Estopped from Asserting a Failure-to-Exhaust Defense.

Even if Swank failed to exhaust his deliberate indifference claim regarding certain alleged denials of care, he argues that Dr. Hale is nonetheless estopped from asserting a failure-to-exhaust defense as to those allegations because the Office of the Chief Inspector (the final arbiter of inmate grievance appeals) fully considered Swank's medical conditions. (*See* Doc. 78, PageID 17-18).  The Magistrate Judge disagreed and found that Swank failed to receive a merits decision as to those allegations from the Chief Inspector *or* during any other stage of the grievance process.  (Doc. 77, PageID 942-44).

Swank looks for support in *Reed-Bey v. Pramstaller*, 603 F.3d 322 (6th Cir. 2010). There, the Sixth Circuit held that "[w]hen prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule will we."  *Reed-Bey*, 603 F.3d at 325.  The court thus concluded that the prisoner had "properly exhausted his claim because he invoked one complete round of the Department's grievance procedures and received merits-based responses at each step."  *Id.* at 326.  In a later decision, however, the Sixth Circuit clarified that "[s]imply mentioning that the prison reviewed the record does not a merits-based response make. . . . [Rather], [f]or *Reed-Bey*'s holding to apply, [the prisoner] would have had to receive 'merits-based responses *at each step*.'" *Cook v. Caruso*, 531 F. App'x 554, 563 (6th Cir. 2013) (quoting *Reed-Bey*, 603 F.3d at 325). It follows, then, that a prisoner's claim is not exhausted where he has not received a merits-based response at each step of the grievance process.  *Id.*; *accord Lee*, 789 F.3d at 680-81 (affirming district court's conclusion that prisoner failed to exhaust his administrative remedies and noting "[the] principle [from *Reed-Bey*] provides no safe harbor" because prisoner did not receive a merits-based response as to each allegation at each step).

13

Here, Swank did not receive a merits-based response as to each allegation at every stage of the grievance process, as required.  He did not complain of his transfer from FHC, the denial of a wheelchair, inaccessible meals, or the denial of physical therapy sessions at *any* stage of the grievance process.  (*See generally* Doc. 62-5, PageID 619-44 [prison grievance records]).  Nor did he receive a merits-based response as to these unalleged harms at any time.  The Chief Inspector, for example, merely referred to these matters in recounting Swank's medical history before issuing a final determination *as to the complained of harms*.  (*Id.* at PageID 619-23 [decision of Chief Inspector in PCI-09-12-000049]; *id.* at PageID 633-34 [decision of Chief Inspector in PCI-09-12-000050]).  And Swank received no response whatsoever as to these allegations after the first two stages of the grievance process.  (*Id.* at PageID 632 [resolution of informal complaint in PCI-09-12-000049]; *id.* at PageID 626-29 [disposition of grievance in PCI-09-12-000049]; *id.* at PageID 644 [resolution of informal complaint in PCI-09-12-000050]; *id.* at PageID 638-41 [disposition of grievance in PCI-09-12-000050]).

Indeed, Swank concedes that he received no merits-based response to these issues after the first two stages of the grievance process.  (*See* Doc. 78, PageID 976-77).  Instead, he argues that the merits-based response at each stage need not be in reference to the specific unexhausted allegations at issue.  (*See id.* at PageID 977 ("The mere fact that a merits-based response occurred at each step was sufficient to invoke the estoppel defense—it was not necessary to inquire what aspects of the grievance were addressed at each stage.")).  Swank's argument, however, cuts against *Reed-Bey* and *Cook* as interpreted in *Lee*, a published opinion.  *See Lee*, 789 F.3d at 680-81 (examining grievances and their resolutions at each stage of the process on an allegation-by-allegation basis, specific to each defendant).  Accordingly, the Magistrate Judge did not err by refusing to apply the doctrine of estoppel to Dr. Hale's defense.

14

### D. Dr. Hale Was Entitled to Summary Judgment on Swank's Deliberate Indifference Claim Regarding all Properly Exhausted Allegations.

The Magistrate Judge recommended that this Court grant Dr. Hale's Motion for Summary Judgment. Nevertheless, because the Magistrate Judge improperly excluded certain materials from her review, as explained in Section III.A., *supra*, summary judgment is inappropriate without first considering those materials. *See* 28 U.S.C. § 636(b)(1) ("The judge may also receive further evidence [in ruling on objections to a report and recommendation]."); Fed. R. Civ. P. 72(b)(3) (same). Swank contends that "[t]he prison medical records improperly excluded . . . demonstrate, at a minimum, the existence of a material issue of fact that precludes summary judgment." (Doc. 78, PageID 977). Upon independent review of those materials, the Court disagrees.

At the outset, the Court notes that, although the Magistrate Judge disclaimed reliance on the materials submitted in "Exhibit B" (Doc. 72), her Report and Recommendation actually relied on many, if not most, of those materials—which *Dr. Hale* independently submitted in connection with his Motion for Summary Judgment. For example, "Exhibit B" contains many of the same grievance records (Doc. 62-5), progress notes and medical charts (Doc. 62-6), physician's orders (Doc. 62-7), MRI results (Doc. 62-8), X-ray results (Doc. 62-9), and authorization requests (Doc. 62-11) that Magistrate Judge King cited liberally throughout her Report and Recommendation. (*See* Doc. 72, PageID 799-907; Doc. 77, PageID 929-59). Likewise, the Report and Recommendation cited frequently to deposition testimony from Dr. Hale and Dr. Saul, who both were questioned about and relied on the very same records Swank filed. (*See* Doc. 61 at PageID 401 [Dr. Hale Dep. at 97:19-98:3]; Doc. 68 at PageID 715 [Dr. Saul Dep. at 93:15-24]). Thus, in reality, the Magistrate Judge's professed exclusion of Swank's materials primarily was an error in form, not substance.

15

Even so, not one of the twelve purportedly overlooked categories of evidence that Swank calls to the Court's attention in his objections demonstrates a genuine dispute of material fact requiring the denial of summary judgment.  (*See* Doc. 78, PageID 977-78).  For example, the first bullet point that Swank lists—"Mr. Swank was transferred to the Frazier Medical Center due to well-documented medical issues requiring specialized care"—simply provides background information that the Magistrate Judge fully accounted for.  (*Compare id.* at 977 [Swank's objections] (discussing lumbar, radiculopathy, knee problems, use of a walker and cane, use of a TENS unit, a pending neurology evaluation for a suspected chiari malformation, shoulder and knee problem, and pain management issues), *with* Doc. 77, PageID 932 [Report & Recommendation] ("Plaintiff was transferred from the Warren Correctional Institute ('WCI') to PCI on July 17, 2012.  Once at PCI, plaintiff shared his medical history and treatment, which included a Type I Chiari Malformation (brain defect that effects balance), 'numerous issues regarding chronic LBP [low back pain,]' epidural steroid injections ('ESIs') at the pain clinic at The Ohio State University ('OSU'), use of a knee brace[,] and use of a Transcutaneous Electrical Nerve Stimulation ('TENS') unit on his lower spine.  Plaintiff was housed for some time in FHC, but at some point was transferred . . . ." (citations omitted))).

The second through sixth bullet points that Swank lists—which relate to his transfer from FMC, his inability to get to the dining hall for meals, his request for a wheelchair, and a purported delay in receiving an MRI (Doc. 78, PageID 977-78)—all relate to allegations that Swank failed to exhaust through Ohio's inmate grievance process.  *See* Sections III.B. – III.C., *supra*.  Accordingly, those categories of evidence have no bearing on whether summary judgment is appropriate on Swank's *exhausted* allegations, which are the only allegations properly before the Court.

16

Finally, the seventh through twelfth bullet points—which relate, in part, to one of Swank's exhausted allegations (denial of a neurology clinic consult for his Chiari Malformation) (Doc. 78, PageID 978)—were considered in full in the Magistrate Judge's Report and Recommendation.[2]  (*See* Doc. 77, PageID 949-51; *id.* at PageID 958).  This category of purportedly overlooked evidence relates to "the arrival of Dr. Kenneth Saul," another prison doctor at PCI who, according to prison records, worked with Swank to assess and treat the deterioration of his spine.  Swank contends that Dr. Saul's actions, including "immediately recogniz[ing] that Mr. Swank required a neurosurgery consult based on the MRI results," coupled with his deposition testimony regarding the delay in time between Dr. Hale requesting the neurology consult (in August 2012) and Swank receiving it (in June 2013), create a genuine dispute of material fact as to Dr. Hale's deliberate indifference to a serious medical need. (Doc. 78, PageID 978).

As Magistrate Judge King explained, however, Swank's Eighth Amendment claim based on the denial and/or delay of his neurology clinic evaluation still fails under *Estelle v. Gamble*, 429 U.S 97, 103-04 (1976), *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), and their progeny— even after accounting for Dr. Saul's actions and testimony.  That is, Swank's claim still fails even construing his allegations in the most favorable light (as required) by assuming the following facts: (1) the neurology clinic evaluation was objectively necessary; (2) Dr. Hale delayed in requesting it (or Swank was delayed in receiving it); and (3) Swank offered verifying medical evidence (via Dr. Saul) to establish a causal link between his injuries and the alleged delay.  (Doc. 78, PageID 948-50).

---

[2] These bullet points also overlap with allegations regarding Swank's spine pain and subsequent treatment.  As the Magistrate Judge correctly observed, "there is no evidence that [Swank] exhausted his administrative remedies as to this claim."  (Doc. 77, PageID 958).  Thus, the Court cannot consider the allegations in bullet points seven through twelve insofar as they extend beyond the allegations regarding the denial and/or delay in Swank's neurological consult due to his Chiari Malformation.

Swank's deliberate indifference claim still fails for two reasons.  *First*, Swank fails to demonstrate a genuine dispute as to whether Dr. Hale *recklessly* disregarded a substantial risk of serious harm.  *See Comstock v. McCrary*, 273 F.3d 693, 703 (2001) ("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs . . . . Instead, deliberate indifference . . . is the equivalent of recklessly disregarding that risk." (quotation omitted)).  The July 25, 2012 MRI, which alerted Dr. Hale to Swank's condition, revealed only a "Type I" Chiari Malformation— the "most common and least serious form" of this brain defect that affects balance.  (Doc. 62-8, PageID 677 [MRI Results]; Doc. 62-3, PageID 613, ¶ 8 [Dr. Eddy Aff.]).  The MRI revealed no acute abnormalities or signs of elevated risk.  (*See* Doc. 62-8, PageID 677).  And while surgery "is the only treatment," for this condition, Swank's malformation "did not have characteristics amenable to surgical intervention."  (Doc. 62-3, PageID 613, ¶ 8).  Nevertheless, Dr. Hale requested a neurological consult to ensure that Swank's condition did not worsen.  (Doc. 61, PageID 394-95).  Soon after, however, an administrative review board overruled Dr. Hale's request and declined to authorize the neurological consult because Swank's condition was only "[S]tage I at this time."  (Doc. 62-6, PageID 654).  On this undisputed factual record, Dr. Hale's actions fall short of recklessness, thus dooming Swank's claim.

*Second*, although Dr. Saul testified that, in his mind, there was too great a delay in obtaining a neurological consult and that Swank suffered pain in the interim, he acknowledged that Dr. Hale was not responsible for that delay:

> Q:    [W]hat I need to know is whether the delay is attributable to Dr. Hale?
>
> A:    **I don't think it's anything he did.**
>
> Q:    Are you aware of any time that he intentionally delayed treatment for Inmate Swank?

A:      **No.**

Q:      Are you aware of any time that he intentionally denied treatment for Inmate Swank?

A:      **He never denied anything.**

Q:      So he never denied any surgeries for Mr. Swank?

A:      **No.**

Q:      And he never denied any braces for Mr. Swank?

A:      **He approved everything I sent in.**

(Doc. 68, PageID 715-16 [Dr. Saul Dep.] (emphasis added)).

Swank overlooks these concessions in his objections—relying instead on Dr. Saul's more ambiguous preliminary statement that he wasn't sure whether the delay was attributable to Dr. Hale.  (Doc. 78, PageID 980 ("Q:  So this delay that we were just talking about, is it attributable to Dr. Hale?  A:  I don't know.  I can't imagine he would do anything like that." (quoting Dr. Saul Dep. at PageID 715)).  Of course, Dr. Saul immediately followed up that ambiguous statement with more definitive testimony, detailed above, when pressed on the issue. Swank can ignore that testimony in trying to create a genuine dispute of material fact all he likes, but this Court cannot.

All told, even though the Magistrate Judge professed that she would not consider the materials that Swank submitted in connection with his opposition to summary judgment, she *did* consider many, if not all, of those materials, which appeared elsewhere in the record.  Moreover, an independent review of the materials that Swank calls to the Court's attention in his objections fails to demonstrate a genuine dispute of material fact necessary to withstand summary judgment.  Accordingly, the Magistrate Judge did not err in recommending that this court grant summary judgment to Dr. Hale.

**E.  The Magistrate Judge Correctly Found that Dr. Hale did not Recklessly Delay Swank's Neurological Consult for his Chiari Malformation.**

Finally, and in an effort to repackage his fourth objection, regarding the propriety of summary judgment, Swank argues that the Magistrate Judge erred by "finding that Defendant did not delay Mr. Swank's medical records [sic—presumably medical treatment] and that the delay did not harm Mr. Swank."  (Doc. 78, PageID 979-80).  This objection focuses exclusively on the purported delay in Swank's neurological consult.  (*Id.*).  As described above, however, the record evidence does not create a genuine dispute of material fact as to whether Dr. Hale acted recklessly with respect to obtaining a neurological consult.  Accordingly, the Magistrate Judge's Report and Recommendation did not err on this point.

Swank persists in alleging that "it took over a year [after his July 25, 2012 MRI] for Defendant to submit a request for Mr. Swank to be seen by a neurologist (ECF No. 72, 0574)."  (Doc. 78, PageID 970).  As the Magistrate Judge properly concluded, however, this allegation is false.  The record evidence that Swank points to (Doc. 72, Page 0574) does not exist.  To the contrary, Dr. Hale testified that he recommended a neurology referral and then advocated for that request during a session of the administrative review board ("the Collegial Review") that has ultimate authority over such specialist-referral decisions.  (Doc. 61, PageID 391-92, 394-95 [Dr. Hale Dep.]).  Swank's interdisciplinary progress notes confirm that the Collegial Review *did* discuss Dr. Hale's referral recommendation on August 22, 2012—less than one month after the relevant MRI.  (Doc. 62-6, PageID 64 ("Spoke at length with Dr. Hale and collegial review about multiple issues [patient] has concerns with.  They are as follows . . . Off-site service requested (list consult, diagnostic): Neuro-eval/Chiari I Malformation. . . .")).  Yet because Swank's malformation was only "[S]tage I," the Collegial Review Committee determined that the consultation was not medically necessary "at this time."  (*Id.*).

Even assuming that Swank suffered from the delay in actually *obtaining* a neurological consult sometime the following year, he still fails to create a genuine dispute as to whether *Dr. Hale* was responsible for that delay—let alone recklessly so.  As explained in Section III.D., *supra*, the only evidence that Swank relies on is a partial snippet from Dr. Saul's deposition, in which he first responded, "I don't know," when asked whether the delay was attributable to Dr. Hale.  (Doc. 68, PageID 714 [Dr. Saul Dep.]).  But Dr. Saul completed that thought by stating, "I can't imagine [Dr. Hale] would do anything like that."  (*Id.* at PageID 174-75).  And just a few moments later, Dr. Saul confirmed when asked point blank "whether the delay is attributable do Dr. Hale" or whether Dr. Hale *ever* intentionally delayed treatment for Swank: **"I don't think it's anything he did,"** and **"No."**  (*Id.* at PageID 715 (emphasis added)).  Dr. Saul's testimony thus falls short of creating a genuine dispute of material fact as to whether Dr. Hale caused any alleged delay in Swank obtaining a neurological consult.

Without a winning argument on the documentary evidence or Dr. Saul's testimony, Swank retreats to a few generic lines from Ohio Department of Rehabilitation and Correction ("ODRC") Medical Policy #68-Med-01.  (Doc. 70-1, PageID 752).  In the definitions section of that Policy, ODRC defines the "Chief Medical Officer" (in this case, Dr. Hale), as "[t]he physician responsible for the day-to-day care of offenders at the institutional level" and "the ultimate medical authority at the institution."  (*Id.*).  From that definition, Swank makes the unsupported leap that "the responsibility rests with Defendant to ensure timely care for Plaintiff, whether or not he personally oversaw the scheduling."  (Doc. 78, PageID 980).  Although Swank goes out of his way to disclaim making a vicarious liability argument (*id.* at PageID 980 n.12), that is *exactly* what he alleges, and the Supreme Court has foreclosed vicarious liability under § 1983 actions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (collecting cases).

Finally, it appears that Swank has abandoned his argument that Dr. Hale consistently failed "to convey the serious medical needs of his patients" during the Collegial Review process and "hid[] behind the guise of Collegial Review's ultimate decision" to defer a neurological consult for his Chiari Malformation.  (*See* Doc. 70, PageID 747 [Mem. in Opp'n to Summ. J.]). Swank nowhere mentions this argument in his objections.  To the extent that Swank's fifth objection can be read broadly enough to incorporate this argument, however, it fails.  As the Magistrate Judge properly concluded, the testimony on which Swank relied simply does not support this contention.  (*See* Doc. 61, PageID 170-72 [Dr. Hale Dep.]).  Dr. Hale was testifying regarding a different course of treatment (namely, a radiology consult for knee pain) at the time and, even so, he testified that he took up for Swank by advocating for the radiology consult. (*Id.* at PageID 171-72 ("Q:  And you're part of collegial review, right?  A:  Yes.  Q:  So you helped in that decision [deferring a radiology consult]?  A:  Right.  But during that visit—during that collegial review, *I'm advocating for the patient to get an MRI.  It's [collegial review's] decision to recommend other treatment.*" (emphasis added)).  At bottom, Swank fails on every level to create a genuine dispute as to whether Dr. Hale was responsible (and recklessly so) for any delay in obtaining the neurological consult for the Type I Chiari Malformation.

## IV.  CONCLUSION

For these reasons, Swank's objections (Doc. 78) are **OVERRULED**.  The Court hereby **ACCEPTS and AFFIRMS** the Magistrate Judge's **Report and Recommendation** (Doc. 77), thereby **GRANTING** Dr. Hale's Motion for Summary Judgment (Doc. 62).

**IT IS SO ORDERED.**

                                    **s/ Algenon L. Marbley**
                                  **ALGENON L. MARBLEY**
                                  **UNITED STATES DISTRICT JUDGE**

**DATED:  March 24, 2016**